## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 3369, and NEW YORK REGION, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,<br><br>              Plaintiffs,<br><br>              v.<br><br>DONALD J. TRUMP, President of the United States of America; FEDERAL SERVICE IMPASSE PANEL; and SOCIAL SECURITY ADMINISTRATION,<br><br>              Defendants. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Federation of Government Employees ("AFGE") Local 3369 ("Local 3369") and the New York Region, American Federation of Government Employees, bring this action against Defendant Donald J. Trump, President of the United States of America, and Defendants Federal Service Impasses Panel ("FSIP") and Social Security Administration ("SSA"), two federal government agencies. The Plaintiff Unions seek a declaratory judgment and injunctive relief.

## INTRODUCTION

Defendant Trump issued Executive Orders 13836, 13837 and 13839 (the "Executive Orders") on May 25, 2018. Exhibits 1, 2 and 3 hereto. By these Executive Orders, Defendant Trump has attempted to legislatively restructure the longstanding policies, practices and procedures of collective bargaining and union representation throughout the entire federal sector

by, among other things: (i) severely restricting the official time available to federal employees for purposes of union representation; (ii) evicting federal unions from all of their offices on government property, offices that they had used for many years by agreement with the federal agencies; and (iii) unilaterally repudiating hundreds of existing agreements between federal agencies and the labor organizations that represent those agencies' employees, including over 45,000 employees of the Defendant SSA represented by AFGE Unions. The Executive Orders violated the labor-management provisions enacted by Congress in the Federal Service Labor Management Relations Act ("FSLMR").

On August 24, 2018, in a suit by federal unions against Defendant Trump and the Office of Personnel Management ("OPM"), specific provisions of Defendant Trump's Executive Orders were found to be *ultra vires* and enjoined by the U.S. District Court for the District of Columbia as contrary to the FSLMR. *American Federation of Government Employees et al. v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2019).

Following the District Court's issuance of the injunction, the OPM then issued a notice, on August 29, 2018, directing that the enjoined provisions of Defendant Trump's Executive Orders be treated as having been "rescinded." Exhibit 4.

Thereafter, on November 8, 2018, a newly-appointed Acting Director of OPM issued Additional Guidance relating to Defendant Trump's Executive Orders encouraging federal agencies to pursue the Executive Orders in the form of collective bargaining proposals. Exhibit 5.

Notwithstanding the District Court injunction, Defendant SSA continued to attempt to impose the *ultra vires* policies of Defendant Trump's Executive Orders on its AFGE-represented employees during the course of collective bargaining and then declared an impasse in bargaining.

At the request of Defendant SSA, Defendant Trump's recently appointed members of the FSIP then issued its impasse decision and Order (the "Impasse Order") directing the SSA to impose the more severe provisions of the Executive Orders, provisions that had been declared invalid and *ultra vires*, in the form of purported contract terms. *Social Security Administration and American Federation of Government Employees*, 2019 FSIP 01 (May 29, 2019). Exhibit 6.

On July 16, 2019, the U.S. Court of Appeals for the D.C. Circuit reversed and vacated the district court's decision and injunction on jurisdictional grounds only without addressing the merits of the case or the legitimacy of Defendant Trump's Executive Orders. *American Federation of Government Employees, et al. v. Donald J. Trump, et al.*, No. 18-5289 (July 16, 2019).

Plaintiffs have no available administrative appeal of Defendant FSIP's May 29, 2019 imposition of President Trump's Executive Order *ultra vires* policies. Thus, absent relief from this Court, Plaintiffs and the SSA employees they represent will suffer irreparable injury for which they will be left without a remedy.

Plaintiffs seek (a) a declaration that, in imposing Defendant Trump's Executive Orders, at the behest of Defendant SSA, Defendant FSIP violated the FSIP's Congressionally determined function and purpose, exceeded its statutory authority, and was *ultra vires*; and (b) an injunction rescinding the Impasse Order and barring SSA from implementing its terms imposing Defendant Trump's Executive Orders.

## **JURISDICTION AND VENUE**

1. The Court has jurisdiction over this action, pursuant to 28 U.S.C. §§1331and 1337, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706 (2)(A) and (C).

2.      Venue of this action properly lies in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(e) because Local 3369 has an office in New York County, so resides in this District, and because AFGE Plaintiffs represent employees of the Social Security Administration in this District.

## PARTIES

3.      Plaintiff Local 3369 is a labor organization located in New York, NY representing employees of the SSA. It is a labor organization as defined in 5 U.S.C. § 7103(a)(4).  It has offices in New York County and Queens County.

4.      Plaintiff New York Region, American Federation of Government Employees, is located in Iselin, N.J., and includes five (5) local AFGE unions in New York, New Jersey and Puerto Rico. It is a labor organization as defined in 5 U.S.C. § 7103(a)(4).

5.      Defendant Donald J. Trump is President of the United States of America. He is sued in his official capacity

6.      Defendant Social Security Administration ("SSA") is an agency of the federal government, as defined in 5 U.S.C. § 7103(a)(3), one that administers social insurance programs including retirement, disability and survivor programs.

7.      Defendant Federal Service Impasses Panel ("FSIP") is the entity established by Congress for the purpose of acting as an impartial body to address and resolve collective bargaining impasses that arise between federal agencies and labor unions representing agency employees in a manner consistent with the requirements of the FSLMR. "Collective bargaining" is defined by statute as "the mutual obligation of the representatives of an agency and the exclusive representative of [agency] employees… to bargain in good faith with respect to terms and conditions of employment affecting such employees…." 5 U.S.C. §7103(a)(12).

4

## THE CIVIL SERVICE REFORM ACT AND THE FEDERAL LABOR-MANAGEMENT RELATIONS STATUTE

8.      Prior to 1978, federal employment was governed by an "outdated patchwork of statutes and rules built up over almost a century." *United States v. Fausto*, 484 U.S. 439, 444 (1988). Congress remedied this state of disarray by enacting the Civil Service Reform Act of 1978 (the "CSRA"), which "comprehensively overhauled the civil service system." *Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 773 (1985).  The CSRA "prescribes in great detail the protections and remedies applicable..." to federal employees. *Fausto*, 484 U.S. at 443.

"In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective bargaining process a more effective instrument of the public interest than it had been under the [prior] regime." *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Rel. Auth.*, 464 U.S. 89, 107 (1983).

9.      Thus, as a central component of this extensive federal civil service reform, Congress enacted the Federal Service Labor-Management Relations statute, 5 U.S.C § 7101 et seq. (the "FSLMR"), explicitly finding "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them" to "safeguard the public interest." 5 U.S.C. § 7101(a)(1).

Through the FSLMR, Congress assigned federal sector labor organizations the job of "act[ing] for" and "negotiating collective bargaining agreements covering" not only their members, but all employees in the bargaining units that they were elected to represent. 5 U.S.C. § 7114(a). Congress did so based upon its conclusion that the work of federal labor organizations "contributes to the effective conduct of public business" and "facilitates and encourages the amicable settlement of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1).

10.     The responsibility that Congress has bestowed on federal labor organizations, like the Plaintiffs herein, requires them to represent all employees in their bargaining units fairly, in good faith and without discrimination, regardless of whether they have joined the union. In Plaintiffs' case, that means providing representation to bargaining unit employees working in over one hundred (100) different SSA offices in New York, New Jersey and Puerto Rico.

## CONGRESS' DECISION TO EXPAND OFFICIAL TIME

11.     To allow federal labor organizations to do what the FSLMR requires of them, Congress consciously and substantially expanded upon the "official time" concept contained in the executive orders that had governed federal sector labor-management relations prior to the FSLMR's enactment. That concept allows union members what is known as "official time" for certain work-related functions involving agencies, labor organizations and the agency employees that they represent.  Hence, Congress decided that managers and labor organizations can perform certain work related functions during the work day, while being paid by the government.

12.     The events leading up to Congress' decision to expand official time show that Congress understood the importance of official time to federal sector labor relations. The Legislative History of the FSLMR shows that an early bill proposed in Senate would have retained then existing restrictions on the authorization of official time. *See BATF*, 464 U.S. 101-02 (citing S. Rep. No. 95-969, at 112 (1978). But Congress instead adopted 5. U.S.C. § 7131 "in its present form." *Id*. at 102. Representative Clay, who controlled the bill that became the enacted legislation, stated emphatically that the union representatives "should be allowed official time to carry out their statutory representational activities just as management uses official time to carry out its responsibilities." *Id.* at 102 (quoting 124 Cong. Rec. 29188 (1978) (remarks of Rep.Clay) and citing H.R. Conf. Rep. No. 95-1717, at 111 (1978)).

6

13.     Through Section 7131 of Title 5, Congress made several fundamentally important policy decisions including that official time be reasonable, necessary and in the public interest. Congress also rejected, completely, the limitations on official time in the executive orders that predated the FSLMR.  It chose, instead, to expressly provide for official time, without limitations, in two circumstances: the negotiating of a collective bargaining agreement and the participation in a proceeding before the Federal Labor Relations Authority ("FLRA"). *See* 5 U.S.C. § 7131(a),(c). Congress further provided that official time could be used for any representational work performed by a labor organization or any other matter related to Chapter 71 of Title 5, so long as it did not relate to the union's "internal business" e.g. "solicitation of membership, election of labor organization officials and collection of dues." 5 U.S.C. § 7131(b).

Congress thus deliberately and significantly expanded upon the concept of official time in the FSLMR, an expansion that better equipped labor unions to handle the broad portfolio of work that the statute obligated them to perform.

## THE FSIP'S JURISDICTION AND PURPOSE

14.     Defendant FSIP is an agency within the Federal Labor Relations Authority ("FLRA"). Congress created the FSIP to "provide assistance" in resolving impasses in collective bargaining that occur between a federal agency and a union regarding terms and conditions of employment of the agency's employees. 5 U.S.C. § 7119(c)(1).

15.     When Congress established the FSIP, it specified that, in providing collective bargaining assistance to federal agencies and unions, the FSIP was to be "above all an impartial body, each of whose members [to] be concerned with the public interest rather than the special interests of either party to an impasse" in collective bargaining. *NTEU Chapter 83 and Dept of Treasury*, 35 FLRA 398, 415-16 (1990) (citing legislative history).

7

16.     The FSIP has no legal authority to act where the collective bargaining between the agency and union is not at a genuine impasse. 5 U.S.C. § 7119(a); 5 CFR § 2471.6. The FSIP's authority to resolve a genuine impasse in collective bargaining between a federal agency and a labor organization is further limited by statute to "action that is necessary *and not inconsistent with* this chapter [5 U.S.C. §§ 7101 et seq.]." 5 U.S.C. § 7119(c)(5)(B)(iii) (emphasis added).

17.     Although the FSIP was at full membership when Defendant Trump took office as President, he terminated and replaced each of the incumbent FSIP members. Each FSIP member serves at the pleasure of Defendant Trump. *See* 5 U.S.C. § 7119(c)(3).

## SOCIAL SECURITY ADMINISTRATION AND AFGE BARGAINING

18.     The employees of Defendant SSA have long been represented for collective bargaining purposes by AFGE Locals, Regions and Councils, including Plaintiffs herein, that together comprise the American Federation of Government Employees Social Security Administration General Committee ("the Unions"). On behalf of approximately 45,000 SSA employees in six (6) bargaining units, the Unions collectively bargain a single national master term agreement. The AFGE locals and Councils also bargain local agreements with SSA, known as memorandum of understanding ("MOUs"), addressing matters that are particular to the federal employees in different SSA regions or offices.

19.     On December 7, 2017, SSA provided notice to the Unions of its intention to terminate the current national collective bargaining agreement and all other agreements (i.e. the MOUs described in para. 18 above) between the parties.

## PRESIDENT TRUMP'S EXECUTIVE ORDERS

20.     On May 25, 2018, President Trump issued the Executive Orders. The Executive Orders unilaterally and radically restructured collective bargaining throughout the federal sector in ways which materially and substantially harmed federal employees and unions, including Plaintiffs herein.

21.     Defendant Trump's Executive Orders were designed to profoundly undermine the ability of unions representing federal employees to effectively bargain for and represent federal employees of every federal agency by imposing mandatory conditions on all collective bargaining agreements between federal agencies and the unions representing their workers. These included, *inter alia*, the following:

- "a negotiating period of between 4 and 6 months" for the parties to complete negotiations for a collective bargaining agreement (Executive Order 13836, Sec. 5(a));

- a unilateral limitation on the collective bargaining process established by Congress: prohibition of bargaining over so-called permissive subjects of bargaining (Executive Order 13836, Sec. 5(b));

- a requirement that each agency "review all binding agreements with collective bargaining representatives" and unilaterally "disapprove" any existing agreements that the Agency deems contrary to the Executive Order's provisions or "any other Presidential directive" (Executive Order 13836, Sec.5(f));

- a severe reduction in the total amount of time (known as "official time") that agency employees who serve as labor organization representatives have available to fulfill the labor organization's statutory responsibility to represent and protect the rights of agency employees by prohibiting agreement to any amount beyond one (1) hour per year for each bargaining unit employee (Executive Order 13837, Sec. 3(a));

- a limit to one-quarter of their agency time the amount of official time that any individual agency employee serving as a labor organization representative may use for the purpose of fulfilling the labor organization's statutory responsibility to represent and protect the rights of agency employees (Executive Order 13837, Sec. 4(a)(ii));

9

- a requirement that agency employees obtain "advance written authorization" from their employing agency for use of official time serving as labor organization representatives except where "prior approval is deemed impracticable" by the agency (Executive Order 13837, Sec. 4(b));

- a severe restriction on the amount of time that federal employees could take as leave without pay ("LWOP") in order to perform their union functions by affording the agency the discretionary authority to regulate the use and amount of such unpaid leave (Executive Order 13837, Sec. 4(e)); and

- a requirement that agencies evict labor organizations from their longstanding and authorized federal government office space used to fulfill the labor organization's statutory responsibility to represent and protect the rights of agency employees (Executive Order 13837, Sec. 4(a)(iii)).

22.     On June 5, 2018, SSA issued notice of its intent to unilaterally impose the terms of the President's Executive Orders upon the Unions and the SSA employees they represent, effective on July 9, 2018, despite that the parties had agreed to commence bargaining for a successor collective bargaining agreement at that time. In a demonstration of good faith, the Unions continued to participate in these negotiations, although they did so under protest.

23.     During the week of June 25, 2018, the parties continued to discuss matters relating to Defendant Trump's Executive Orders. Defendant SSA proposed, *inter alia*, severe limitations in permitted uses of official time. SSA also informed the Unions it had no interest in continuing to provide office space to the Unions moving forward, resulting in the immediate evictions of the SSA employees' collective bargaining representatives. Most unions representing SSA employees had been provided office space by agreement with the SSA for decades, and those on- premises union offices enabled the unions to efficiently represent SSA employee, and to do so in a manner which allowed the employees to have access to union representation without having to leave their workplace. The parties did not reach any agreement through bargaining.

10

Thereafter, Defendant SSA referred the matter to Defendant FSIP with a request that the FSIP assert jurisdiction over the purported collective bargaining impasses, including a purported impasse on the terms contained in the SSA's Executive Order-based directives.

24.     On July 9, 2018, Defendant SSA unilaterally imposed new ground rules for the ongoing collective bargaining, in order to impose the terms of Defendant Trump's Executive Orders, and gave notice to the Unions that they were being evicted from their government office spaces, giving them until July 31, 2018 to vacate their offices, including removal of any and all Union materials, documents, furniture, and equipment.

25.     From July 17 through 26, 2018, under SSA's unilaterally imposed new ground rules, the parties began negotiations for a new collective bargaining agreement. Many of SSA's proposals were identical or virtually identical to the provisions of Defendant Trump's Executive Orders.

## THE FEDERAL DISTRICT COURT'S DECISION AND INJUNCTION

26.     On August 24, 2018, the U.S. District Court for the District of Columbia enjoined as "invalid" a number of the provisions of President Trump's Executive Orders, including the provisions referred to in paragraph 22 above. *AFGE et al. v. Trump*, 318 F. Supp. 3d 370 (D.D.C 2018).

27.     On August 29, 2018, the OPM formally notified the federal agencies that Executive Order 13836 §§ 5(a), 5(e) and 6, Executive Order 13837 §§ 3(a), 4(a) and 4(b), and Executive Order 13839 §§ 3, 4(a) and 4(c), had been enjoined and that the provisions in question "should be considered rescinded." Exhibit 4.

28.     On October 5, 2018, Defendant Trump appointed Margaret Weichert to be the new Acting Director of OPM. On November 8, 2018, the new Acting Director of OPM issued

"Additional Guidance Relating to Implementation of Executive Orders 13836, 13837 and 13839"

(the "Additional Guidance"). Exhibit 5. Contrary to OPM's August 29 directive, this

Memorandum encouraged all federal agencies to continue to pursue imposition of the terms of

President Trump's Executive Orders but to do so by converting the terms of the Executive

Orders into the form of contract proposals, regardless of the District Court decision and

injunction, and regardless of OPM's earlier directive that the enjoined terms of the Executive

Orders were to be treated as having been "rescinded." The Additional Guidance was an attempt

to circumvent the decision of the District Court.

29.     On July 16, 2019, on the appeal of Defendants Trump and OPM, the U.S. Court

of Appeals for the D.C. Circuit reversed and vacated the District Court's decision on

jurisdictional grounds without addressing the merits of the case or the legitimacy of Defendant

Trump's Executive Orders. *American Federation of Government Employees, et al. v. Donald J.*

*Trump, et al.*, No. 18-5289 (July 16, 2019).

**DEFENDANT SSA'S ATTEMPT TO RE-IMPOSE THE EXECUTIVE ORDERS**

30.     As of December 2018, six months after bargaining began, the parties had

continued their bargaining and reached agreement on many issues. Defendant SSA continued,

however, to attempt to impose Defendant Trump's Executive Orders, repackaged in accord with

OPM's recent directive as contract proposals, and notwithstanding the district court injunction

and the previous OPM directive of August 29, 2018, that the Executive Orders were to be treated

by federal agencies as having been "rescinded." Unresolved issues that remained on the

bargaining table, as of December 2018, included:

- The Unions' continuing access to SSA office space for activities necessary to fulfill
  the Unions' statutory responsibility to represent and protect the rights of agency
  employees;

- The amount of official time available to SSA employees who serve as labor organization representatives to use for the purpose of fulfilling the labor organization's statutory responsibility to represent and protect the rights of agency employees;

- The amount of official time available to any individual SSA employee serving as a labor organization representative to use for the purpose of fulfilling the labor organization's statutory responsibility to represent and protect the rights of agency employees;

- Defendant SSA's proposal to require pre-approval from management for employees who serve as labor organization representatives and now forced to use Leave Without Pay ("LWOP") for the purpose of fulfilling the labor organization's statutory responsibility to represent and protect the rights of agency employees;

- The duration of the collective bargaining agreement; and

- SSA's proposal to unilaterally terminate over one thousand (1,000) local memorandums of understanding (i.e. local collective bargaining agreements) that govern a range of employee rights.

31. On December 13, 2018, and in accord with Defendant Trump's then enjoined directive in Executive Order 13836, Sec.5(a), that no agency should engage in bargaining for more than six (6) months, SSA demanded that the Federal Mediation and Conciliation Service ("FMCS") mediator release the parties from further bargaining so that the matter could be submitted to Defendant FSIP for resolution. The FMCS Mediator released the parties on December 20, 2018.

32. On January 10, 2019, Defendant SSA submitted a filing to the FSIP claiming that the parties were at a genuine collective bargaining impasse on the unresolved issues and asking the FSIP to resolve those issues.

33. The Unions filed an opposition to SSA's request on March 4, 2019, including on the bases that the FSIP did not have jurisdiction because the parties were not at a genuine impasse in bargaining and that SSA was instead attempting to circumvent the District Court decision by re-imposing the provisions of Defendant Trump's Executive Orders repackaged in

the form of contract proposals. The Trump-appointed FSIP chose to assert jurisdiction over the matter on March 26, 2019.

34.     Defendant SSA and the Unions each submitted to the FSIP the party's positions on the issues that FSIP had characterized to be at impasse, along with a statement regarding the rationale for the party's position. The parties filed their initial submissions with the FSIP on April 17, 2019, and their reply submissions on May 1, 2019.

### FSIP'S DECISION TO IMPLEMENT THE EXECUTIVE ORDERS IN PART

35.     On May 29, 2019, Defendant FSIP issued its Impasse Order. Exhibit 6. That ruling purported to resolve the alleged collective bargaining "impasse" and to impose terms for a collective bargaining agreement between Defendant SSA and the Unions. *Social Security Administration and American Federation of Government Employees*, 2019 FSIP 019 (May 28, 2019). In reality, the Trump-appointed FSIP was converted from an impartial impasse resolution agency into a vehicle to impose the more severe provisions of Defendant Trump's Executive Orders. The FSIP's Impasse Order closed by "order[ing] the parties to adopt the provisions stated above." *Id.* at 27.

### A.  Imposition Of the Executive Order's Prohibition Against Union Use Of Government Office Space

36.     Defendant FSIP imposed SSA's proposal to implement Defendant Trump's Executive Order 13837, Section 4(a)(ii), by evicting the Unions from all of their offices on SSA government property, and barring the Unions from use of any SSA office space for activities necessary to fulfill the Union's statutory responsibility to represent and protect the rights of agency employees, with SSA making space available only at its option, and only "for union meetings upon reasonable requests."

14

For more than twenty (20) years, the collective bargaining agreements between SSA and the Unions have provided for government office space to be used for the many day-to-day activities necessary for a labor organization to fulfill its statutory duty under the FSLRMA. Such activities include but are not limited to meetings with individual employees or groups of employees regarding actions taken or threatened against them by management, speaking with potential witnesses to actions taken by management, preparing for meetings with representatives of management, researching and drafting grievance statements, arbitration briefs, and other written materials, reviewing written directives and other materials issued by management to determine whether they are or are not consistent with governing collective bargaining agreements, and maintaining files regarding the many on-going matters involving the federal employees represented by the labor organization.

Moreover, by making space for Union meetings available only if SSA management unilaterally determines, in advance, whether or not *the SSA* considers the request for use of government space to be "reasonable," the FSIP has assigned to the SSA the legal authority to supervise and control the ability of AFGE Unions to represent SSA employees. Rather than the Unions deciding whether and when a Union meeting is needed, the FSIP Impasse Order gives that authority and discretion to SSA management.

37.     By imposing Defendant Trump's directive in Executive Order 13837 to evict AFGE unions from their government office space, and his directive to involve management in matters that should be between federal employees and their chosen labor organization representative, Defendant FSIP severely undermined the ability of the Unions to provide collective bargaining and representation for SSA employees.

### B.  Imposition of the Executive Order's Restrictions Against Use of Official Time For Union Representatives

38.    Defendant FSIP imposed SSA's proposal to implement with Defendant Trump's Executive Order 13637, Sec. 3, by limiting to 50,000 hours per year the total amount of official time hours available to all SSA employees who serve as labor organization representatives to use for the purpose of fulfilling the labor organization's statutory responsibility to represent and protect the rights of all 45,000 SSA bargaining unit employees, thereby limiting the total amount of official time to the equivalent of 1.1 hour per SSA employee. This represents a reduction of over 80% of the preexisting amount of official time allowed for Union representational activities.

39.    By imposing this provision, embodying Defendant Trump's Executive Order, Defendant FSIP created and imposed an entirely arbitrary and one-sided labor management system upon the parties, contrary to Congress' intention in enacting 5 U.S.C. § 7131. *BATF*, 464 U.S. at 101-2. The SSA presently devotes 115 Full-Time Employees – that is 239,200 official hours per year – to representing its management interests in labor-management issues. In contrast, under the FSIP's imposed system, the Unions' official time is reduced by over 80% to a 50,000 official hour limitation upon its ability to represent the over 45,000 bargaining unit employees. Thus, SSA management is allowed nearly *five (5) times* the amount of paid government time as compared to Union representation from the same government budget.

40.    Notably, in imposing the arbitrary and severe restriction in Defendant Trump's Executive Order on the preexisting level of official time available to Union representatives, Defendant FSIP *explicitly* conceded that there was no factual basis for doing so: Defendant SSA had "offered little justification … to buttress its proposed amount of official time," notwithstanding the FSIP's express acknowledgment of the governing statutory requirement that "*any* party offering a quantitative amount of official time pursuant to §7131(d) should

demonstrate to the Panel why its proposal is 'reasonable, necessary and in the public interest."
2019 FSIP 019 at 23 (citing 5 U.S.C.§7131(d)) (emphasis in original).

41.     By imposing Defendant Trump's directive in Executive Order 13837, Sec. 3, to
minimize official time to an amount as close to the rate of one (1) hour per employee as possible,
Defendant FSIP severely undermined the ability of the Unions to provide collective bargaining
representation to SSA employees.

42.     The FSIP's imposition of this arbitrary individual cap on official time ensures that
those individuals with the most experience and ability in representing SSA employees will be
foreclosed from providing representation to their fellow employees.

43.     By imposing Defendant Trump's directive to limit the amount of official time that
an individual agency employee serving as a labor organization representative may use for that
purpose, Defendant FSIP severely undermined the ability of the Unions to provide collective
bargaining representation to SSA employees and, in doing so, interfered with the Union's
obligation and duty to provide fair representation to SSA employees, leaving the Union
vulnerable to unfair labor practice charges and lawsuits alleging that it did not fulfill it duty of
fair representation.

### C.  Precluding Official Time For Union Representatives On Leave Without Pay

44.     The FSIP also imposed SSA's proposal to implement Defendant Trump's
Executive Order 13837, by requiring pre-approval from management for employees who serve
as labor organization representatives to use a maximum of 80 hours of Leave Without Pay
("LWOP") for the purpose of fulfilling the labor organization's statutory responsibility to
represent and protect the rights of agency employees.  Under prior collective bargaining
agreements, Union representatives were allowed LWOP up to one (1) year for this purpose.

17

The FSIP-imposed restriction on the use of LWOP for representational purposes is particularly harmful in combination with the FSIP's imposition of a 50,000-hour cap on overall official time and will cut off another source of potential time for the Unions' representatives to provide services under the FSLMR to SSA employees. As with the requirement that SSA management must pre-approve specific requests to hold a union meeting, Defendant FSIP with this provision again unlawfully inserts the agency into the relationship between federal employees and their chosen representative labor organizations. If the Unions determine that more than 50,000 hours is needed to provide SSA employees with proper representation under the FSLMR, Union representatives may "request" that the SSA provide LWOP for that purpose. SSA, however, retains the power to monitor and the discretion to deny any and all such requests. Thus, it is SSA management – not the Unions – that will prescribe how much representation activity the Unions can engage in.

45.     By imposing Defendant Trump's Executive Order directives to severely restrict the amount of official time available to SSA employees to perform representational activities under the FSLMR, and to require SSA pre-approval of the Unions' and the employees' representational activities, Defendant FSIP severely undermined the ability of the Unions to bargain for and represent SSA employees and, in doing so, exceeded its authority and undermined the union's ability to represent SSA employees.

### D.  Imposition of a Seven-Year Contract Term

46.     In accord with Defendant Trump's Executive Order 13836 to minimize the opportunity for and expense of collective bargaining, the FSIP adopted the SSA's proposal that the new collective bargaining agreement have a duration period of seven (7) years.

18

47.     The seven-year contract duration period imposed by the FSIP is substantially longer than typical collective bargaining agreements in the federal sector and would effectively institutionalize the FSIP's imposition of the radically adverse terms of Defendant Trump's Executive Orders upon SSA employees and the Unions, and would leave the Union's representational status vulnerable to attack after the first three (3) years. 5 U.S.C. § 7111(f)(3)(A); 5 C.F.R. § 2422.12. Additionally, the imposition of a seven (7) year collective bargaining agreement leaves the Union and SSA employees helpless and vulnerable as they would be unable to bargain in regards to changing circumstances of technology, culture, economics and efficiency, thereby making the Union less responsive and necessary to the employees it represents.

## E.  Authorization of SSA's Unlawful Repudiation of Existing Agreements Between SSA and AFGE

48.     Defendant FSIP also imposed SSA's proposal to implement Defendant Trump's Executive Order 13836, Section 5(f), by unilaterally terminating over one thousand (1,000) local memoranda of understanding ("MOUs") (i.e. local collective bargaining agreements) that currently govern a range of employee rights in SSA regions and offices.

49.     Defendant FSIP's Impasse Order, issued by Defendant Trump's newly appointed FSIP members with the assistance of Defendant SSA, violated the FSIP's Congressionally defined function and purpose; it is categorically *not* an FSIP determination as intended by Congress: a decision of "an impartial body" to "assist the parties in resolving a [genuine] impasse" in federal sector collective bargaining which may arise "between agencies and exclusive representatives," 5 U.S.C. § 7119(c) (1). The FSIP Impasse Order is instead an attempt by Defendants Trump and SSA to utilize Defendant FSIP as a vehicle to re-impose the terms of Defendant Trump's Executive Orders and his underlying political agenda in order to radically

restructure federal sector labor relations and make the Unions less responsive and necessary to the employees it represents. When Defendant Trump's earlier attempt to impose his Executive Orders was frustrated by the District Court's decision holding invalid and enjoining key provisions of his Executive Orders, Defendants Trump, SSA and FSIP simply re-imposed the more severe of those same provisions, repackaged in the form of SSA contract proposals. The FSIP Impasse Order, as relevant here, does not address collective bargaining disputes between "agencies and exclusive representatives," pursuant to 5 U.S.C. § 7119(c)(1), but instead is simply the imposition of Defendant Trump's declared legislative and political agenda to undermine the ability of the unions to provide representation services to SSA employees and make them less responsive and necessary to the employees they represent.

50.    Finally, the FSIP Order to deprive the Union of office space is consistent with all of the above as a tactic to separate the Union from its membership and eventually make the federal sector, if not union free, union ineffective. Such would be an irreparable injury to all federal employees in need of union representation that is no longer available for the reasons cited, above.

## IRREPARABLE HARM

51.    Plaintiffs and the SSA employees they represent will be irreparably harmed by the FSIP Order. This Order will severely restrict the ability of the Plaintiffs' members to act as Union representatives of SSA employees and will impair the Plaintiffs' ability to carry out their responsibility to ensure that employees are treated in accordance with applicable law, regulations and collective bargaining agreements. The official time cap will lead to Union representatives being deterred from performing, or being unable to perform, essential union functions, thereby defeating the scheme that Congress enacted. And, it will discourage union representatives from

engaging in activities for which official time is entirely appropriate because those employees will not want to exhaust their limited official time allotment prematurely.

52.     The intended irreparable consequence will be that grievances alleging contract violations will not be processed, and the Unions will be unable to enforce collective bargaining agreements, and disciplined SSA employees will have to suffer unwarranted discipline as Union representatives will be restricted in representing them. And the Unions will suffer irreparable financial harm should they not be able to fulfill their duty of fair representation and be the subject of litigation for such failure.

53.     Additionally, union representatives who choose to fulfill their duty of fair representation but are without official time can only, and voluntarily, use LWOP (Leave Without Pay) or annual leave.  Union representatives who choose to fulfill their duty of fair representation using LWOP will be irreparably harmed as LWOP is not considered for purposes of negotiated benefits such as retirement, sick leave, vacation, FMLA, etc. As a result, the employees represented by the Unions will be deprived of its expertise and resources in grievance proceedings including, but not limited to, grievances challenging unlawful discrimination, unjust suspensions and removals, and illegal pay and evaluation practices.

54.     Plaintiffs will be irreparably harmed as they are denied the bargains struck when AFGE entered into the many MOU's that are being discarded by the FSIP Order; and the Plaintiff cannot recover consideration that it gave in exchange for the any benefit the MOU conferred.

55.     If successful, this misuse of the FSIP's processes to impose Defendant Trump's Executive Orders will be repeated in future collective bargaining negotiations between other federal agencies and unions.

56.     Absent timely, declaratory and injunctive relief from this Court, Defendants will impose the terms of Defendant Trump's Executive Orders upon the Unions in the immediate future.

**PLAINTIFFS' LACK ANY ADMINISTRATIVE REMEDY**

57.     Plaintiffs and the SSA employees they represent have no ability to appeal or directly challenge the legality of Defendant FSIP's attempt to impose the terms of Defendant Trump's Executive Orders through existing administrative procedures. Decisions of the FSIP are *not* subject to administrative appeal to the FLRA. *State of New York, Div. of Military and Naval Affairs*, 2 FLRA 186, 188 (1979) (citing legislative history). Administrative review of any FSIP decision may only occur through unfair labor practice procedures initiated by a party alleging noncompliance with the FSIP decision at issue. *Id.* The Unions have no ability to bring the FSIP Impasse Order in this case before the FLRA in an unfair labor practice proceeding because they have no opportunity to refuse to comply with FSIP's decision in favor of Defendant SSA and because Defendant SSA cannot refuse to comply with the decision by Defendant FSIP in the SSA's favor.

58.     Neither Plaintiffs nor the SSA employees they represent have meaningful administrative review under the APA. *Thunder Basin Coal Co. v. Reich*, 510 U.S 200, 212 (1994). Plaintiffs do not challenge the specifics of Defendant FSIP's Impasse Order as they might in any ordinary collective bargaining context but the misuse of the FSIP as a political agent of Defendant Trump.  And even if Plaintiffs had a viable administrative remedy before the FLRA, which they do not, there would not be any available remedy for the loss of official time, loss of the contents and benefit of the bargain of a thousand (1,000) MOUs, and loss of office space in the several years that an administrative appeal would take, let alone for the loss of

22

effective representation for SSA employees in the interim. Further, this challenge to the FSIP decision is "wholly collateral" and directed to restrain the FSIP's decision itself. 510 U.S. at 213. Defendant FSIP has no expertise to evaluate the validity or legality of Defendant Trump's Executive Orders. 510 U.S. at 215.

## CLAIMS FOR RELIEF

59.     Plaintiffs incorporate paragraphs 1-58 above, as if alleged fully herein.

### FIRST CLAIM FOR RELIEF
### The FSIP's Decision is *Ultra Vires*

60.     The decision issued by Defendant FSIP, at the behest of the Defendant SSA, imposed the more severe terms of Defendant Trump's Executive Orders and policies, including: (a) reducing official time for SSA employees to represent their fellow SSA employees by more than 80%; (b) barring the use of governmental property for Union offices; (c) imposing a seven-year agreement; and (d) unlawfully repudiating over 1,000 current memoranda of understanding between the parties.

61.     The decision by Defendants Trump and SSA to utilize Defendant FSIP as a vehicle to impose the terms of Defendant Trump's Executive Orders and his political and legislative agenda to radically restructure federal sector labor relations and to render the Union less responsive and necessary to the employees it represents was contrary to, and in violation of the purpose for which Congress established Defendant FSIP: to "provide assistance" to the parties engaged in traditional collective bargaining over the terms and conditions of federal employees and, in doing so, to be "above all an impartial body, each of whose members [to] be concerned with the public interest rather than the special interests of either party to an impasse" in collective bargaining. *NTEU Chapter 83 and Dept of Treasury*, 35 FLRA 398, 415-16 (1990) (citing legislative history).

23

62.     Defendant FSIP's Impasse Order, issued with the assistance of Defendant SSA, was likewise contrary to the then-pending determination of the federal District Court, now vacated, decreeing invalid and enjoining those specific provisions of Defendant Trump's Executive Orders, as well as the OPM's subsequent directive that those same enjoined provisions are to be treated as having been "rescinded."

63.     Defendant FSIP's decision to impose Defendant Trump's Executive Orders and to thereby authorize Defendant SSA's unilateral repudiation of over one thousand (1,000) local MOU agreements, was an independent violation of Defendant FSIP's governing statute, 5 U.S.C. § 7119(c)(5)(B)(iii), which requires the FSIP to issue decisions that are "necessary and not inconsistent" with the FSLMR.  It is a violation of the FSLMR for an agency to unilaterally repudiate an agreement with the union representing its employees, let alone unilaterally terminating over one thousand (1,000) MOUs in one stroke. *Cornelius v. Nutt*, 472 U.S. 648, 664-65 (1985).

64.     Defendant FSIP's decision was therefore "inconsistent with" the FSLMR and therefore contrary to 5 U.S.C. §7119(c)(5)(B)(iii).

65.     By taking action to impose the terms of Defendant Trump's Executive Orders, in violation of the FSIP's Congressional purpose and beyond its statutory authority, in disregard of the District Court's then pending injunction and the OPM's subsequent directive, and contrary to the applicable statutory provisions, Defendant FSIP's issuance of its Impasse Order was *ultra vires* and thus must be enjoined. *Leedom v. Kyne*, 358 U.S. 184, 188 (1958); *Council of Prison Locals v. Brewer*, 735 F. 2d 1497, 1500-1501 (D.C. Cir. 1984); *Saget v. Trump*, 345 F. Supp. 3d 287, 297-98 (E.D.N.Y. 2018).

## SECOND CLAIM FOR RELIEF
### The FSIP Decision is Arbitrary and Capricious, in Excess of the FSIP's
### Statutory Authority and in Violation of the Administrative Procedure Act

66.     The APA directs federal courts to hold unlawful and to set aside a federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "in excess of statutory jurisdiction, authority or limitations…" 5 U.S.C. §§ 706(2)(A) and (2)(C).

67.     Defendant FSIP's decision to impose the terms of Defendant Trump's Executive Orders, at the behest of Defendant SSA, violated the FSIP's Congressional purpose to act "above all [as] an impartial body, each of whose members [to] be concerned with the public interest rather than the special interests of either party to an impasse;" and was contrary to the then pending decision of the federal District Court enjoining those terms as invalid and contrary to the FSLMR; contrary to the OPM directive that the enjoined provisions be treated as "rescinded;" and contrary to Defendant FSIP's  governing statute. 5 U.S.C. § 7119(c)(5)(B)(iii).

68.     Therefore, Defendant FSIP's decision is "arbitrary, capricious, an abuse of discretion, not in accordance with law" and "in excess of statutory jurisdiction, authority or limitations…" and in violation of Sections 706(2)(A), and (2)(C) of the APA.

## RELIEF REQUESTED

69.     Plaintiffs respectfully request the Court to issue the following relief:

A.     To issue a declaratory judgment and injunction negating the decision of the FSIP to impose the terms of Defendant Trump's Executive Orders to be *ultra vires*, contrary to the FSLMR and in violation of the APA;

B.     To enjoin Defendant SSA's implementation of the decision of Defendant FSIP;

C.      To award Plaintiffs their attorney's fees and costs; and

D.      To award Plaintiffs such other and further relief as is just and proper.

Dated: September 4, 2019

OSBORNE LAW OFFICES, P.C.

_William Osborne  By MBK w/ AVTH._

William Osborne (Pro Hac Vice Motion
  Motion To Be Filed)
1130 Connecticut Ave., NW, Suite 950
Washington, DC  20036
(202) 243-3200
bosborne@osbornelaw.com


COHEN, WEISS and SIMON LLP


 _/s/ Hanan B. Kolko_
Hanan B. Kolko
900 Third Avenue, Suite 2100
New York, NY 10022
(212) 563-4100
hkolko@cwsny.com


*Attorneys for Plaintiff*

26